399 So.2d 1005 (1981)
Dr. Philip GLATSTEIN, Lynn Glatstein, Leonard Turkel and Annsheila Turkel, Appellants,
v.
The CITY OF MIAMI, a Florida Municipal Corporation, and Diplomat World Enterprises Ltd., a Limited Partnership under the Laws of the State of Florida, Appellees.
No. 80-57.
District Court of Appeal of Florida, Third District.
May 26, 1981.
Rehearing Denied July 6, 1981.
*1006 Hall & Hauser, Andrew C. Hall, and Gail V. Ferrington, Miami, for appellants.
George F. Knox, Jr., City Atty., and Mikele S. Carter, Asst. City Atty., Aronovitz & Weksler and Alfred Aronovitz, Miami, for appellees.
Before HENDRY, NESBITT and FERGUSON, JJ.
NESBITT, Judge.
Plaintiffs/appellants, who are citizens and taxpayers, commenced this suit for declaratory injunctive relief against the defendants/appellees seeking to enjoin the proposed development of Watson Island as a theme amusement park. Their six-count complaint alleged that:
COUNT I, the development of Watson Island as a theme amusement park was a material departure from the "Master Use Plan" adopted by the City of Miami in 1973, and violated deed restrictions from the State of Florida requiring the city to use the island solely and exclusively for public purposes;
COUNT II, the original agreement between the city and Diplomat World Enterprises Ltd. (Diplomat), dated November 11, 1977, constituted a joint venture agreement in violation of Article VII, Section 10 of the Florida Constitution;
*1007 COUNT III, the amendment of June 4, 1979 to the original contract failed to cure the illegality alleged in Count II;
COUNT IV, the original contract violated Article VII, Sections 3, and Section 10, which prohibits the pledging of credit for private purposes, of the Florida Constitution, and Section 196.199(2)(a), Florida Statutes (1977), which defines exemptions applicable to municipally owned and operated properties when used to serve a governmental, municipal, or public purpose as defined in Section 196.012(5).
COUNT V, (a), the original contract was executed contrary to the city charter, which requires invitations for competitive bidding to be executed according to detail plans; and that (b) the amendment to the original agreement failed to correct the illegality alleged in Count IV; and
COUNT VI, the development constituted a private nuisance.
After the cause was at issue and extensive discovery had been made, the defendants moved for and procured a summary final judgment. Because we are of the unqualified view that the trial court erred in failing to find that the competitive bidding provisions of the city charter were patently violated [Count V, (a)], we reverse and remand for the entry of a declaratory judgment determining that the violations of the competitive bidding provisions of the Miami City Charter render the challenged contract and amendment thereto void.
The original contract between the city and Diplomat, executed November 11, 1977, was essentially a management contract for the theme park yet to be planned and developed by Diplomat. The funding and consequent risks were to be borne by the city. The project was to be funded in the amount of $55,000,000 through the issuance of certificates of indebtedness secured initially by a pledge of gross revenues received less current obligations, and by non ad valorem taxes and franchise fees not otherwise pledged. The gross revenues were to be divided between the city and Diplomat on a percentage basis. The agreement was to run for a period of thirty years.
The amendment to the above agreement executed June 4, 1979:
(1) reduced the term of the contract from thirty to five years;
(2) altered the calculations as to the amount of revenue Diplomat was to receive from an "increasing percentage on an increasing gross revenue" formula to a five-year fixed management fee totaling $12,000,000; and
(3) additionally provided that in the event that the non ad valorem tax sources were deemed by a court of competent jurisdiction to be taxable, that Diplomat would receive a tax credit pro tanto.
In early 1977, after previous attempts to develop Watson Island were unsuccessful, the Miami City Commission requested proposals for its development based upon a plan then in existence (prepared by the firm of Fowler, Ettinger, Potter & Hart) and upon an economic feasibility study (prepared by Economic Research Associates). This published invitation for bids requested interested parties to submit proposals based upon those plans and additionally authorized proposals which would alter or modify the design scheme specified. The invitation for bids indicated that a $35,000,000 budget had been established for the project with a contingency for an additional $10,000,000. Five proposals were submitted in response to the invitation for bids. By resolution, the city adopted the proposal submitted by Diplomat and a contract was entered into between the city and Diplomat on November 11, 1977. The proposal submitted by Diplomat, though adopted by the city on November 11, 1977, was based upon a design plan prepared by R. Duell and Associates, which was not ultimately finalized until January of 1978. Additionally, the proposal submitted by Diplomat and accepted by the city was for an estimated $55,000,000 as opposed to $45,000,000 budgeted in the invitation for bids.[1]
*1008 The pertinent provision of the City of Miami Charter regarding competitive bids, Section 53, requires that:
Before authorizing the direct execution of any work or improvement, detailed plans and estimates thereof shall be submitted to the commission by the city manager and there shall be separate accounting as to each work or improvement so executed. [emphasis supplied]
In Wester v. Belote, 103 Fla. 976, 138 So. 721 (1931), the Supreme Court of Florida held:
[I]t is the duty of public officers charged with the responsibility of letting contracts under the statute to adopt, in advance of calling for bids, reasonably definite plans or specifications, as a basis on which bids may be received. Such officers, in view of such requirement, are without power to reserve in the plans or specifications so prepared in advance of the letting the power to make exceptions, releases, and modifications in the contract after it is let, which will afford opportunities for favoritism, whether any favoritism is actually practiced or not. Neither can they include other reservations which by their necessary effect will render it impossible to make an exact comparison of the bids.
... .
That a contract made by public officers in violation of the statutes requiring them to be let pursuant to competitive bids, to the best responsible bidder, is absolutely void, and no rights can be acquired thereunder by the contracting party, is beyond question in this jurisdiction. [emphasis supplied]
138 So. at 724.
A reading of the Section 53 of the city charter, referred to above, gauged against Wester v. Belote, supra, makes it readily apparent that the material variance between the detailed plans upon which competitive bidding was proposed to be submitted and that which was submitted by Diplomat and ultimately adopted by the city renders the contract void. We have previously recognized that a lease concession agreement which was materially and substantially different from the published invitation required by a city's charter was void. City of Miami Beach v. Klinger, 179 So.2d 864 (Fla.3d DCA 1965). Diplomat's proposal not only altered the design plans for the theme park but also embodied a management contract as its primary element. Because of this infirmity, it requires no reason or authority to recognize that the amendment to the original contract, which could not and did not overcome this fundamental deficiency, is also void.[2]
The appellees implore us to determine that the collateral bond proceeding, in which some $55,000,000 in certificates of indebtedness to be issued by the City of Miami were validated, precludes an assault on the instant contract because the trial court, in the collateral bond validation proceeding, made a finding that the city had the power to enter into the contract herein disputed. In construing Sections 75.02, 75.07, and 75.09, Florida Statutes (1979), concerning bond validation, our Supreme Court has uniformly held that a bond validation and its underlying purpose becomes unassailable in collateral proceedings. State v. City of Miami, 379 So.2d 651 (Fla. 1980); State v. Sarasota County, 372 So.2d 1115 (Fla. 1979); State v. City of Sunrise, 354 So.2d 1206 (Fla. 1978); Lipford v. Harris, 212 So.2d 766 (Fla. 1968); State v. City of Miami, 103 So.2d 185 (Fla. 1958). However, most of the cases understandably recognize that there are limitations upon the doctrine. We find the most recent pronouncement as to the limitations in bond validation proceedings expressed in McCoy Restaurants, Inc. v. City of Orlando, 392 So.2d 252 (Fla. 1980), where it was stated that:

*1009 The sole purpose of a validation proceeding is to determine whether the issuing body had the authority to act under the constitution and laws of the state and to ensure that it exercised that authority in accordance with the spirit and intent of the law.
392 So.2d at 253. In McCoy Restaurants, Inc., the Supreme Court recognized that a lease agreement between the aviation authority and the restauranteur was collateral to the bond validation proceeding and, consequently, the appellant did not have standing to contest the validity of the lease agreement in the same proceeding. That case, directly in point, clearly supports the plaintiff's standing to challenge the agreements between Diplomat and the City of Miami even though a bond validation proceeding has already been maintained. The appellants are not collaterally estopped from bringing an action on questions which were precluded from consideration in the bond validation proceeding.
The next position asserted by the appellees in support of the contract is that Section 16-20 of the City of Miami Code[3] expressly exempts contracts for professional services from bidding requirements and that the management and development of the theme park constituted a professional service. This was a management contract and not a contract for professional services which normally encompasses planning or design proposals. Moreover, this argument ignores the simple fact that the invitation for competitive bids also solicited a request for plans for the development of Watson Island. Absent specific plans, no bidding could take place. If the city had "detailed" plans, as expressly required by Section 53 of the city charter, ready for competitive bidding, there was no need for further solicitation of plans from any source.
Viewing the several provisions of the city charter here in issue, it is apparent that the city is exempt from seeking competitive bids for design plans, feasibility studies, and other similar professional services so that, with firm plans in hand, they may request bids on sufficiently detailed and specific plans and thereby promote intelligent and competitive bidding as envisioned by the city charter. The contract with Diplomat was for management and operation of the completed park. The management aspects of the contract should be subject to the competitive biddings requirements.
Finding the determination of Count V to be dispositive, we do not address appellants' other contentions. Consequently, there being no material facts in dispute, we reverse the order of the trial court granting summary final judgment with directions to enter a declaratory judgment for the appellants upon Count V of the complaint determining the contract and amendment thereto void.[4]
Reversed and remanded with directions.
NOTES
[1] The proposal for bids allowed the bidder to design and bid on their own plan. Diplomat did just that. The plan as designed for Diplomat, which included a management contract, was never competitively bid nor could it have been under this proposal because it was not in existence at the time the bidding was advertised.
[2] Assuming the original agreement had been valid, we do not reach the question of whether the modifications made by the amendment were so substantial so as to circumvent the competitive bidding requirements.
[3] This section has subsequently been renumbered as § 18-54.
[4] A summary judgment may be entered for a non-moving party where the other party moves for a summary judgment and the record discloses the non-moving party is entitled to summary judgment. Carpineta v. Shields, 70 So.2d 573 (Fla. 1954); Jockey Club. Inc. v. Blake, 297 So.2d 44 (Fla.3d DCA 1974); King v. L & L Investors, Inc., 133 So.2d 744 (Fla.3d DCA 1961). The better practice is to file cross-motions, Carpineta v. Shields, supra.