# Third District Court of Appeal

## State of Florida

Opinion filed October 26, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-1039
Lower Tribunal No. 14-24334
_____

**Stephen Herbits, et al.,**
Appellants,

vs.

**The City of Miami, et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Monica Gordo, Judge.

Dubbin & Kravetz and Samuel J. Dubbin, P.A.; Carlton Fields Jorden Burt and Richard J. Ovelmen and Enrique D. Arana and Justin S. Wales and Namrata S. Joshi, for appellants.

Greenberg Traurig and Elliot H. Scherker, Alan T. Dimond, Brigid F. Cech Samole and Jay A. Yagoda; Victoria Méndez, City Attorney, and John A. Greco, Deputy City Attorney, and Forrest L. Andrews, Assistant City Attorney, for appellees.

Before ROTHENBERG, SALTER and SCALES, JJ.

SALTER, J.

The seven appellants, plaintiffs in the circuit court (collectively "Appellants"), are five individuals residing in the City of Miami and two residing in the City of Miami Beach. The appellees, defendants below, are the City of Miami ("City") and Flagstone Island Gardens, LLC ("Flagstone"), a private development entity. The Appellants appeal the dismissal with prejudice of their third amended verified complaint[1] seeking declaratory and injunctive relief regarding Flagstone's plans to lease and develop public land on Watson Island for use as a mega-yacht marina, two hotels, over 380,000 square feet of retail and commercial space, and parking facilities.

The primary issue presented below and here is whether the Appellants have alleged a legally sufficient basis for standing to assert five claims against the City and Flagstone under provisions within the City of Miami Charter, the Miami-Dade County Citizens' Bill of Rights, and the agreements between the City and Flagstone as enacted in City resolutions. For the reasons which follow, we affirm the trial court's dismissal of the complaint with prejudice.

I.   Facts and Procedural Background

---

[1] We refer to the third amended verified complaint for declaratory and injunctive relief as the "complaint."

2

In light of the standard of review applicable to an order dismissing a complaint with prejudice, we recount the facts as detailed in the Appellants' 55-page complaint and its 35 attached exhibits.[2]

A.    The Project

The Flagstone project, as initially presented via referendum in November 2001, shape-shifted into something quite different by the time of the incarnation described in the complaint filed in December 2014.  In late 2000, the City Commission enacted resolution 00-1081, authorizing an RFP for a mixed use development on City-owned property[3] along the MacArthur Causeway on Watson Island.  The resolution required that the RFP comply with City Charter section 29-B by providing the City with "at least fair market value" for the long-term lease payments.  Flagstone's winning response to the RFP specified that the "Island Gardens" project would combine "hotels, retail, dining, entertainment, gardens and

_____

[2]    The 35 exhibits attached to the complaint comprise nearly 500 pages of documents pertaining to the Flagstone project and its evolution, including City ordinances and Commission resolutions, the City's request for proposals ("RFP") and Flagstone's response, the ballot question presented to the voters in 2001, drafts and signed versions of an "agreement to enter into ground lease" between the City and Flagstone, a traffic study, an appraisal, and communications regarding the submerged lands/marina element of the project with State agencies.  These documents are considered a part of the complaint "for all purposes."  Fla. R. Civ. P. 1.130(b).

[3]  The City-owned property was approximately 11 acres of waterfront land, but the development also was to include about 13 acres of submerged lands for the marina component.  The property is subject to a deed restriction in favor of the State dating back to the State's conveyance of Watson Island to the City.

a selection of cultural facilities and civic art as an intimate village adjacent to one of the finest purpose-built mega-yacht marinas in the world." Flagstone represented that the project would involve a total project cost of $281 million (of which Flagstone itself would contribute and raise $112 million).

In September 2001, the City Commission enacted resolution 01-971 designating Flagstone as the successful respondent to the RFP and authorizing a long-term lease of the property for 45 years (with two 15-year renewal options) and annual rent of "$2,000,000 as the minimum annual guaranteed base rent," with annual increases based on the Consumer Price Index and a percentage of gross receipts. As required by section 29-C of the City Charter, City voters were presented with a ballot question regarding the proposed lease of public lands in a special election conducted November 6, 2001:

> Shall the City lease City-owned land consisting of 24.2 total upland and submerged acres on Watson Island to Flagstone Properties, LLC, for development of a mega yacht marina, fish market, hotels with timeshare units, a maritime museum, public gardens, cultural facilities, restaurants, retail and support facilities, for 45 years with two 15-year renewals, subject to capital investment, subject to a minimum guaranteed rent of $2,000,000 and other conditions the City may require?

Although the voters approved the ballot question, the City did not specify a time for commencement of the lease or the "guaranteed rent of $2,000,000." In January 2003, the City and Flagstone signed an agreement to enter into a ground lease. This agreement was subject to numerous conditions and approvals, as were

4

the three amendments to it. In 2010, nine years after the referendum, the City and Flagstone executed an "amended and restated agreement to enter into ground lease," also subject to numerous conditions precedent and further documentation. Through the filing of the complaint in 2014, Flagstone and the City had not actually entered into a ground lease, nor had Flagstone taken possession of any part of the property or begun to pay rent.

Although an appraisal obtained by the City in 2013 set the fair market value of an annual lease payment for the property at over $7 million, the City renegotiated, reduced, and deferred annual lease payments from a "minimum annual guaranteed base rent" of $2 million to annual amounts that were to increase incrementally from $300,000 for the year beginning October 1, 2010, to $1 million, by October 1, 2013 ("construction rent"), to $2 million beginning October 1, 2018, and thereafter. As noted, however, these terms were provisional and were not embodied in binding, written ground leases with terms that had actually commenced.

The development and investment partners involved in the Flagstone project also changed frequently from the list provided in Flagstone's RFP response to those participating by 2014. The financial crisis of 2008 was allegedly a factor, but the changes in co-developers and site plans culminated in extensive renegotiation of the Flagstone-City agreement to enter into a ground lease.

5

In late 2009, the City Attorney approved a form of resolution authorizing termination of the agreement to enter into ground lease based on non-payment of rent and Flagstone's failure to discharge or bond various liens on the property. During the period 2010 through 2012, City staff and the Commission continued to discuss whether the agreements should be terminated and a new RFP and referendum process initiated.

In July 2012, an Assistant City Attorney opined that changes to the terms of the City-Flagstone agreement would violate the 2001 referendum, and a private attorney working for Flagstone opined that an annual compensation to the City of less than $2 million would require a new referendum and a new RFP. The complaint also alleges that critical information on the modifications, deadlines, appraised value, and changes in the City itself—particularly traffic—between 2001 and 2014 were concealed from the public.

There is no doubt that mixed use development projects of the intended size and scale of the Flagstone project are complex in many respects, including zoning and permitting, financing, and construction. But the verified allegations in the complaint and the exhibits describe a moving target that tied up a prime piece of public waterfront for 14 years without moving from paper plans to the high-rise buildings, cultural facilities and marina for mega-yachts described in Flagstone's winning RFP submission and the City referendum. Collectively, the "Agreement

6

to Enter Ground Lease" of late 2002, the amendments in 2004, 2006, and 2008, and the "Amended and Restated Agreement to Enter into Ground Lease" of 2010,[4] seem to comprise in substance an option to develop the property rather than a ground lease providing a "guaranteed" annual financial return to the City.

B.    The Lawsuits[5]

Appellant Stephen Herbits, joined by Robert Zimmerman (not a party to the 2014 lawsuit at issue here) initially challenged a City zoning resolution pertaining to the Flagstone project in 2004. Their petition for certiorari to quash City resolution R-04-0462 (adopting a major use special permit and various special permits to allow construction of improvements) was denied by the appellate division of the Miami-Dade Circuit Court in early 2005. Herbits v. City of Miami, 12 Fla. L. Weekly Supp. 432a (Fla. 11th Cir. Ct. App. Div. Mar. 1, 2005).

In 2013 and 2014, Mr. Herbits filed public records lawsuits against the City in order to obtain documents pursuant to Chapter 119, Florida Statutes (2013).

---

[4] Exhibit 34 to the complaint, extending the deadline for visible commencement of construction to June 2, 2014.

[5] It bears mentioning that two of the plaintiffs/Appellants, Dr. Glatstein and Ms. Turkel, prevailed in this Court over 35 years ago when they successfully challenged the City's authority to enter into an agreement for "the proposed development of Watson Island as a theme amusement park." Glatstein v. City of Miami, 399 So. 2d 1005, 1006 (Fla. 3d DCA 1981). The sense of history repeating itself is invoked by the phrase within that opinion, "In early 1977, after previous attempts to develop Watson Island were unsuccessful . . . ." Id. at 1007.

After the 2013 lawsuit was filed, the City produced the appraisal showing that the fair market rental value for the property to be leased had increased to over $7 million.

Mr. Herbits and 1000 Venetian Way Condominium, Inc. (not a party here), also petitioned for administrative review of the decision by the Board of Trustees of the Internal Improvement Trust Fund to approve the City's request for modifications to the deed restrictions on the submerged lands that were slated to become the site of the marina within the Flagstone project. When the Board of Trustees dismissed their request with prejudice, Mr. Herbits and 1000 Venetian Way appealed to the District Court of Appeal, First District, in Tallahassee. In a split decision, that Court affirmed the dismissal, concluding that the petitioners failed to establish that the parties' substantial interests would be affected. Herbits v. Bd. of Trs. of Internal Improvement Tr. Fund, 195 So. 3d 1149 (Fla. 1st DCA 2016).

In September 2014, Mr. Herbits commenced the present lawsuit. Additional plaintiffs/Appellants were joined, and Flagstone was allowed to intervene as a defendant. The third amended complaint at issue here was filed in December 2014.

C. Verified Allegations Regarding "Special Injury"

8

The City and Flagstone persuaded the trial court to dismiss earlier versions of the complaint for lack of standing and a failure to allege "special injury." In section III of this opinion we assess whether such allegations are in fact required as to count IV, but the Appellants did amend to add allegations of special injury applicable to all five counts:

> Plaintiffs Herbits, Craver, Shapiro, and Wynne reside on the Venetian Causeway, directly across a narrow body of water from Watson Island and the project which is the subject of this lawsuit. They, along with their neighbors at 1000 Venetian Way and 801 North Venetian Drive, live closer to the Flagstone project than any other City of Miami or Miami Beach residents, and will be directly harmed by the increased traffic, impairments to public safety, short and long-term negative environmental impacts, subsidies to the developer, loss of public open space, lost or reduced property values, and other impacts which the Flagstone Project will cause.
>
> * * * * *
>
> Given Plaintiffs' proximity and direct use on or near Watson Island. They will be forced to bear a disproportionate price for the City of Miami's illegal actions, and suffer substantial and immediate injuries, greater in kind than the injuries that will be suffered by the public in general from the Project.

Compl. ¶8.

> [Plaintiffs Pepper and Turkel, residing on Island Avenue, Miami Beach] will be substantially and adversely affected by the increased traffic, short and long-term negative environmental impacts, and other negative impacts which the project will cause.
>
> * * * * *
>
> Given Ms. Turkel's and Mr. Pepper's proximity and direct use on or near Watson Island, they will be required to bear a disproportionate price for the City of Miami's illegal actions, and will suffer substantial and immediate injuries beyond those suffered by the public in general from the project.

9

Compl. ¶9.

> [Plaintiff Dr. Philip Glatstein] will be substantially and adversely affected by the increased traffic, short and long-term negative environmental impacts, subsidies to the developer, loss of public open space, and other impacts which the project will cause.
>
> * * * * *
>
> Therefore, Dr. Glatstein will suffer substantial and immediate injuries beyond those suffered by the public in general from the project.

Compl. ¶11.

> As alleged above, Plaintiffs will suffer special injuries from the Project that are different in kind than the community at large because they will be harmed by the increased traffic, diminished public safety, lost or reduced property values, increased environmental risks, loss of public open space, subsidies to the developer, and other harms the City has disregarded, and even concealed and misrepresented, and which are inextricably related to the City's actions to extend and reauthorize the Flagstone project in 2010, 2011, 2012, 2013, and 2014, extensions and reauthorizations which are inextricably connected to the City's concessions that violate City of Miami Charter Sections 29-A, 29-B, and 29-C.

Compl. ¶59.

> Plaintiffs, as citizens, taxpayers, and electors in the City of Miami, who will be adversely affected by the development and who will suffer injuries different in kind than other members of the community, are in genuine doubt about their rights as to the legality of the currently approved Flagstone Project.

Compl. ¶60.

The allegations of fact in the complaint were sworn to be true and correct by the Appellants under penalty of perjury.

D.    Dismissal with Prejudice

The City and Flagstone moved to dismiss the present complaint, and those motions were heard by the trial court in March 2015. The court granted the motions to dismiss with prejudice, determining that the alleged violations of the City Charter (Counts I, II, and III) could not be prosecuted without sufficiently pleading "special injuries" rather than alleged injuries relating to the Flagstone project's "general impact from a land use perspective." As to the County Charter and Citizens' Bill of Rights (Count IV), the trial court held that the Charter provisions in effect incorporated the standing requirements imposed by general law, including the same "special injuries" pleading requirements.

The trial court also found that Count IV, "based on allegations that certain City officials and employees failed to provide the public with full and accurate information in a timely fashion, is preempted by the Florida Public Records Act. See Tribune Co. v. Cannella, 458 So. 2d 1075, 1077 (Fla. 1984)." The trial court found Count V legally insufficient as the Appellants were neither parties to, nor third-party beneficiaries of, the City-Flagstone agreements, so that they "have no right to challenge the Agreements, or to seek a declaration from the Court that the Agreements should be terminated." Finally, the court concluded that further amendment to cure these deficiencies would be impossible, and thus that the complaint should be dismissed with prejudice.

11

This appeal ensued.

II.    Standard of Review

"Determining whether a party has standing is a pure question of law to be reviewed de novo." Alachua Cty. v. Scharps, 855 So. 2d 195, 198 (Fla. 1st DCA 2003.) In reviewing an order dismissing a complaint with prejudice, "[w]e assume that all allegations in the complaint are true, and we construe all reasonable inferences from those allegations in favor of [the plaintiff]." Greene v. Times Publ'g Co., 130 So. 3d 724, 728 (Fla. 3d DCA 2014) (citing United Auto. Ins. Co. v. Law Offices of Michael Libman, 46 So. 3d 1101, 1103-04 (Fla. 3d DCA 2010)).

"The trial court is bound by the four corners of the complaint and attachments, and all ambiguities and inferences drawn from 'the recitals in the complaint, together with the exhibits attached,' must be construed in the light most favorable to the plaintiff." Lonestar Alt. Sol., Inc. v. Leview-Boymelgreen Soleil Developers, LLC, 10 So. 3d 1169, 1172 (Fla. 3d DCA 2009) (quoting Vinneau v. Metro. Life Ins. Co., 548 So. 2d 856, 858 (Fla. 4th DCA 1989)).

III.    Analysis

"[T]he Florida Supreme Court has repeatedly held that citizens and taxpayers lack standing to challenge a governmental action unless they demonstrate either a special injury, different from the injuries to other citizens and taxpayers, or unless the claim is based on the violation of a provision of the

12

Constitution that governs the taxing and spending powers." Solares v. City of Miami, 166 So. 3d 887, 888 (Fla. 3d DCA 2015) (citing Sch. Bd. of Volusia Cty. v. Clayton, 691 So. 2d 1066, 1068 (Fla. 1997); N. Broward Hosp. Dist. v. Fornes, 476 So. 2d 154, 155 (Fla. 1985); Henry L. Doherty & Co. v. Joachim, 200 So. 238, 240 (Fla. 1941); Rickman v. Whitehurst, 74 So. 205, 207 (Fla. 1917)).

There is a further exception, however, when legislation provides a cause of action and standing to private citizens. Fla. Wildlife Fed'n v. State Dep't of Envtl. Regulation, 390 So. 2d 64 (Fla. 1980). As we explain below in section III.D. of this opinion (addressing Count IV of the complaint), that exception applies to the unique rights conferred through the Miami-Dade County Home Rule Charter and its Citizens' Bill of Rights. As a duly enacted source of rights and standing, the Citizens' Bill of Rights was neither raised nor considered in the taxpayer standing decisions of the Florida Supreme Court cited above, or in our decisions in Solares and Kneapler v. City of Miami, 173 So. 3d 1002 (Fla. 3d DCA 2015). The fact that standing was conferred by the Citizens' Bill of Rights does not, however, end our analysis of Count IV, a claim found legally insufficient for other reasons.

A. Count I: City of Miami Charter Section 29-B

In Count I, the Appellants allege that the City violated section 29-B of the City Charter by failing to lease the property to Flagstone with "a return to the city of fair market value." The Appellants thus seek a declaratory judgment

invalidating City resolution R-10-0402, a "complete renegotiation of the financial terms of the previously approved Fourth Amendment and Restated Agreement to Enter Ground Lease," at an annual rental far below the property's fair market value at the time of the resolution (September 2010), and invalidating further City action regarding the lease for the same reason. It has not been alleged, however, that the City and Flagstone are bound by a fully-executed and enforceable lease as opposed to an "agreement to agree" subject to a number of open conditions precedent.

This claim is also raised in Count IV of the complaint as a violation of the Miami-Dade County Citizens' Bill of Rights, but we do not consider that basis for standing in this section. Rather, the standing issue as to Count I addressed by the trial court and reviewed here is whether the Appellants have suffered or will suffer "special injury" by virtue of the alleged violations of City Charter section 29-B.

Reviewing the verified allegations (excerpted in section I.C. above) of special injury, we agree with and affirm the trial court's determination that the Appellants have alleged in conclusory fashion what are in essence zoning and land use objections. The Appellants may be closer in proximity to the alleged adverse traffic conditions caused by a completed Island Gardens project, for example, but the City's alleged failure to obtain a fair market rental for the property has not been shown to affect the seven Appellants in a manner "different in kind,"[6] not merely greater in degree, than it affects other residents throughout the City.

14

The zoning, land use, and permitting objections of the Appellants were addressed in Mr. Herbits' prior, unsuccessful litigation addressed in section I.B of this opinion.[7] The lack of a different kind of injury as between the Appellants and other citizens applies as well to the other alleged categories of injury described in the complaint, such as "diminished public safety, lost or reduced property values, increased environmental risks, loss of public open space, subsidies to the developer, and other harms the City has disregarded." Assuming all such allegations to be true, the Appellants' proximity-to-the-property claims also fail to satisfy what may be called a nexus requirement as part of the "special injury" rule enunciated in Rickman, Henry L. Doherty & Co., Fornes, and Solares. "The taxpayer's injury specially induced by the unlawful act is the basis of his equity, and unless it is alleged and proved, there can be no equitable relief." Rickman, 74 So. at 206 (emphasis provided). In the present case, the special injuries caused by the City's alleged violation of City Charter section 29-B do not have a nexus—a causal relationship— to the violation. The alleged violation, a failure to obtain fair market value for the property to be leased to Flagstone, might cause an adverse fiscal impact to all taxpayers, but it cannot be said to "cause" the alleged adverse

_____

[6] Henry L. Doherty & Co., 200 So. at 240.

[7] The Appellants' standing to challenge the City's land use and zoning decisions relating to the project are governed by the Growth Management Act of 1985 and a separate statute, section 163.3215, Florida Statutes (2014); see Pinecrest Lakes, Inc. v. Shidel, 795 So. 2d 191 (Fla. 4th DCA 2001).

traffic, environmental, and esthetic injuries claimed by the appellants. The alleged special injuries are claimed to be caused by the development of the proposed project, not the fact that the City may negotiate a rental amount below fair market value.

Considering the violation of City Charter section 29-B in isolation, then, as alleged in Count I—and without considering the more developed articulation of the claim based on the Citizens' Bill of Rights—we affirm the dismissal of Count I with prejudice.

### B. Count II: City of Miami Charter Section 29-C

In Count II, the Appellants allege that the City deviated in 2010 (and thereafter) from the transaction advertised in the RFP and approved in the November 2001 referendum, in violation of City Charter section 29-C. The allegations do not establish, however, that any final, unconditional, and binding terms have been entered into by the City and Flagstone. The amended and restated agreement to enter into a ground lease is essentially a letter of intent subject to various open (as-yet unfulfilled) conditions.

Turning to the question of standing, "special injury," and nexus, it is apparent that the alleged Charter violations in this Count affect all voters, taxpayers, and citizens of the City in substantially the same way. As in the case of Count I, the injuries alleged by the Appellants are in substance zoning, land use,

16

and permitting objections to the project, rather than injuries resulting directly from the alteration and protraction of the business terms of the lease. The Appellants would suffer the alleged injuries as a result of the development itself, not as a result of the fact that the City has allowed or may allow Flagstone to develop a project materially different than the project specified in the RFP, Flagstone's proposal, and the referendum.

Although the violations of section 29-C must be separately analyzed for legal sufficiency based on the Citizens' Bill of Rights (Count IV), as a separate and independent claim we are constrained to affirm the dismissal of Count II with prejudice for failure to establish special injury, nexus, and standing.

### C. Count III: City of Miami Charter Section 29-A

Count III alleges violations of City Charter section 29-A, prohibiting a lease of City property without public notice and an opportunity for the public to compete for the transaction. The Appellants allege that the transaction as it was recast in 2010 through 2014 is so different in material terms that the City violated section 29-A by failing to promulgate an updated RFP for new competition and submissions.

Without considering the additional analysis implicated by the Citizens' Bill of Rights, Count III also lacks allegations of resulting injury that are unique or distinct as to the Appellants. As with Counts I and II, the alleged special injuries

17

do not have a nexus to the alleged Charter violation. There is no allegation, for example, that the Appellants would respond to a new RFP if publicized and issued. Although we find that the allegations establish a prima facie case for violation of section 29-A by the City and Flagstone, and although we analyze the issue separately as an element of Count IV, we affirm the dismissal of Count III with prejudice based on a lack of special injury, nexus, and standing when the violation of section 29-A is asserted as a separate and independent claim. We are also unable to determine that the City and Flagstone are bound to a definitive lease (or leases) as opposed to an agreement that remains subject to as-yet-unfulfilled conditions.

In affirming the dismissal of Counts I, II, and III—each of which alleges violations by the City of specific requirements of its own Charter—we are rejecting the Appellants' arguments for standing based on cases such as <u>Kelner v. City of Miami Beach</u>, 252 So. 2d 870 (Fla. 3d DCA 1971), and <u>Renard v. Dade County.</u>, 249 So. 2d 500 (Fla. 3d DCA 1971). In <u>Kelner</u>, this Court held that the special damages requirement "has no application where a person affected seeks to challenge such action of the city <u>on the ground that the action was illegal</u>, or that the proceedings before the city council which resulted in such action were conducted contrary to the provisions of the charter, such as by failure of the city to

18

give notice required by its charter, as alleged here." Kelner, 252 So. 2d at 871 (emphasis added).

In Renard, we held that special damage is necessary when a plaintiff seeks to enforce an existing zoning ordinance, but not necessary "when a plaintiff seeks to have an act of a zoning authority declared void or is within the immediate area to be affected." Renard, 249 So. 2d at 502. We conclude that these holdings in Kelner and Renard have been impliedly overruled by the Supreme Court of Florida's later cases regarding standing, as articulated in this Court's recent opinion in Solares, 166 So. 3d at 888.

Finally, we consider the "maxim that for every wrong there is a remedy." Dominguez v. Bucyrus-Erie Co., 503 So. 2d 364, 365 (Fla. 3d DCA 1987) (citation omitted) addressing Art. I, § 21, Fla. Const. providing that "[t]he courts shall be open to every person for redress of any injury"). The standing requirement in Rickman is based on a policy that the taxpayer's remedy for wrongs of the kind detailed in Counts I, II, and III of the complaint "should be at the polls and not in the courts." Paul v. Blake, 376 So. 2d 256, 259 (Fla. 3d DCA 1979).

D.    Count IV: Miami-Dade Citizens' Bill of Rights

We affirm the trial court's dismissal with prejudice of Count IV, but for reasons other than lack of standing. We conclude that the Miami-Dade Citizens'

19

Bill of Rights provides remedies for truth in government violations, but not for the possible and prospective ordinance violations alleged in the complaint.

As already noted, the Miami-Dade County Home Rule Charter provides a special set of rights to Miami-Dade County citizens. Under Article VIII, section 11, of the Florida Constitution of 1885, the electors of the County were granted the power to "adopt, revise, and amend from time to time a home rule charter of government" for the County. These rights were preserved and kept in full force and effect in Article VIII, section 6, of the Florida Constitution of 1968.

The County's Home Rule Charter is to be "liberally construed" to carry out the purpose of providing home rule for the people of Miami-Dade County in local affairs. The Citizens' Bill of Rights is a part of that Charter, and its promise "to protect the governed, not the governing," applies with equal force to municipalities within the boundaries of the County.

In Krantzler v. Board of County Commissioners of Dade County, 354 So. 2d 126 (Fla. 3d DCA 1978), this Court recounted the provisions of the Citizens' Bill of Rights relating to truth in government, remedies for violations, and construction. The plaintiffs/appellants in that case alleged that the County Commission had illegally expended County funds for the publication and distribution of a "propagandist and misleading" brochure in support of a sales tax increase to fund a mass transit proposal. Id. at 129. This Court reversed an order of dismissal with

20

prejudice to allow the plaintiffs to sharpen the allegations supporting their claim for equitable relief.

In doing so, the Court considered the taxpayer standing rule as enunciated in <u>Rickman</u>, and other authorities. The Appellants in the present case thus argue that <u>Krantzler</u> supports their own present claim that an untruthful communication by a municipal official presents a legally sufficient claim for violation of the Citizens' Bill of Rights. The complaint by the Appellants alleges violations of these excerpted provisions of the Citizens' Bill of Rights:

> (A).2. **Truth in Government.** No County or municipal official or employee shall knowingly furnish false information on any public matter, nor knowingly omit significant facts when giving requested information to members of the public.
>
> 3. **Public Records.** All audits, reports, minutes, documents and other public records of the County and the municipalities and their boards, agencies, departments and authorities shall be open for inspection at reasonable times and places convenient to the public.
> * * * * *
> (C). **Remedies for Violations.** A citizen may bring a cause of action alleging a violation of this Article filed in the Dade County Circuit Court pursuant to its general equity jurisdiction and if successful, shall be entitled to recover costs as fixed by the Court.
> * * * * *
> (D). **Construction.** All provisions of this Article shall be construed to be supplementary to and not in conflict with the general laws of Florida.

The Appellants have alleged that the City violated section 29-B of the City of Miami Charter and the Citizens' Bill of Rights by concealing appraisal information from the public regarding the true rental value of the Flagstone project

21

real estate; that the City violated section 29-C of the City of Miami Charter and the Citizens' Bill of Rights by concealing from the public information reflecting the substantial and material differences between the project as described in the 2001 RFP and referendum and the project as it was renegotiated between 2010 and 2014; and that the City violated section 29-A of the City of Miami Charter and the Citizens' Bill of Rights by concealing from the public the fact that those changes in the project required an updated notice and RFP solicitation process.

The complaint does not establish, however, that any final and legally binding lease terms for the project site are in place. The fair market rental value of the property as of the date Flagstone will take possession (if ever) has not been alleged. The complaint has not alleged that the original RFP process was subverted or corrupted. The referendum and RFP apparently did not disclose a deadline for the execution of a binding lease or the latest permissible commencement of a minimum annual guaranteed rent payment, and it is not alleged by any other party that submitted a response to the RFP that it was deceived by the process.

In essence, then, the Appellants already have obtained relief—by investigating and highlighting the delays and changes in the proposed project. That process does not, however, mean that a court should enjoin or otherwise interfere with a process that is inherently legislative. To the contrary, courts

22

traditionally give deference to the legislative process and the differences of opinion that emerge as a Commission makes its decisions.  Silvio Membreno & Fla. Ass'n of Vendors, Inc. v. City of Hialeah, 188 So. 3d 13 (Fla. 3d DCA 2016); Lamb v. Dade Cty., 159 So. 2d 477 (Fla. 3d DCA 1964); Senior Citizens Protective League, Inc. v. McNayr, 132 So. 2d 237 (Fla. 3d DCA 1961).

We affirm the trial court's alternative basis for dismissing the Appellants' public records claims in Count IV with prejudice.  The trial court concluded that the Appellants' claim regarding public records is "preempted by the Florida Public Records Act," citing Tribune Co., 458 So. 2d at 1077.  Local government records are included in the definition of "public records" for purposes of the Florida public records statutes.  § 119.011(12), Fla. Stat. (2016).  The Florida Legislature has so pervasively legislated regarding this subject area that a local government is precluded from legislating in the same area.  Sarasota All. For Fair Elections, Inc. v. Browning, 28 So. 3d 880, 886 (Fla. 2010).

The City and Flagstone have raised two arguments in opposition to the application of the provisions of the Citizens' Bill of Rights.  First, they argue that section (C), "Remedies for Violations," provides a remedy, but does not expressly confer standing in the manner that the environmental statute, section 403.412(2)(a), Florida Statutes (1977), did in Florida Wildlife Federation, 390 So. 2d at 64. We reject that argument; the environmental statute authorized the

23

Department of Legal Affairs, any political subdivision or municipality of the state, "or a citizen of the state," to maintain an action for injunctive relief. Id. at 65 n.1. Similarly, the Citizens' Bill of Rights remedy provision expressly applies to "a citizen."

Second, the City and Flagstone rely on section (D) of the Citizens' Bill of Rights, requiring our construction of these rights to be "supplementary to and not in conflict with the general laws of Florida." The City and Flagstone argue that the "general laws of Florida" as used in that provision refer not only to legislative enactments, but also to the judicial decisions limiting taxpayer and citizen standing as described above in section III. According to this argument, the "general laws" would thus include the "special injury or constitutional challenge" requirements detailed in Solares, and the cases relied upon by that opinion.

This argument fails as well. Section 11(5) of the Florida Constitution of 1885 and section 6(e) of Article VIII of the Florida Constitution of 1968, establishing the framework for the Home Rule Charter for Miami-Dade County, refer to "the power of the Legislature to enact general laws which shall relate to Dade County." Contextually, section (D) of the Citizens' Bill of Rights in the Home Rule Charter does not expand the definition of "general laws" to engraft judicial limitations on taxpayer standing into the specific remedies provided to each citizen in section (C).

The Florida Supreme Court has defined "general law" as one that "operates universally throughout the state, or uniformly upon subjects as they may exist throughout the state, or uniformly within permissible classifications by population of counties or otherwise, or is a law relating to a state function or instrumentality." Fla. Dep't of Bus. & Prof'l Regulation v. Gulfstream Park Racing Ass'n, Inc., 967 So. 2d 802, 807 (Fla. 2007) (quoting State ex rel. Landis v. Harris, 163 So. 237, 240 (Fla. 1934)). The Florida Supreme Court has also "consistently construed the phrase 'inconsistent with general law'. . . to mean 'contradictory in the sense of legislative provisions which cannot coexist.'" State v. Sarasota Cty., 549 So. 2d 659, 660 (Fla. 1989) (emphasis added) (citing Laborers' Int'l Union of N. Am., Local 478 v. Burroughs, 541 So. 2d 1160 (Fla.1989); State ex. rel. Dade Cty. v. Brautigam, 224 So. 2d 688, 692 (Fla. 1969)).

For these reasons, we find that the Appellants had legal standing to bring a claim under the Citizens' Bill of Rights, but we do not find a legally sufficient cause of action within Count IV on the record before us.

E. Count V: Termination of City-Flagstone Agreements

Count V asserts a claim by the Appellants for Flagstone's breach of a material term of the Amended and Restated Agreement to Enter Into Ground Lease between Flagstone and the City—the failure to begin "the actual act of physical construction" by June 2, 2014. The complaint alleges that the City and Flagstone

25

tried to gloss over this breach by recharacterizing a diver's underwater activities before that date (to map and survey sea grasses and coral for environmental mitigation) as visible construction activity. The complaint further alleges that Flagstone had not obtained all required permits in place by June 2, 2014, as required.

We affirm the trial court's dismissal of this count with prejudice on the grounds set forth in the order of dismissal: "Because these Plaintiffs and other members of the general public are neither parties to these Agreements nor third party beneficiaries thereunder, they have no right to challenge the Agreements, or to seek a declaration from the Court that the Agreements should be terminated. See Security Mut. Cas. Co. v. Pacura, 402 So. 2d 1266, 1267 (Fla. 3d DCA 1981)."

IV. Conclusion

For the reasons detailed in this opinion, we affirm the trial court's dismissal of each count of the complaint with prejudice.