DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CITIZENS FOR RESPONSIBLE DEVELOPMENT, INC.,**
a Florida not-for-profit corporation, and **HERBERT SIMPSON,**
Appellants,

v.

**THE CITY OF DANIA BEACH, FLORIDA, BROWARD COUNTY, FLORIDA** and **DANIA ENTERTAINMENT CENTER, LLC,**
a Delaware limited liability company,
Appellees.

No. 4D21-1306

[February 15, 2023]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Keathan Frink, Judge; L.T. Case No. CACE11-22597.

Michael E. Dutko, Jr. and Janine R. McGuire of Conrad & Scherer LLP, Fort Lauderdale, for appellants.

Andrea G. Amigo, George P. Roberts, Jr., and Lyman H. Reynolds, Jr. of Roberts Reynolds Bedard & Tuzzio, PLCC, West Palm Beach, for appellee, The City of Dania Beach, Florida.

Andrew J. Meyers, Joseph K. Jarone and Scott Andron, Broward County Attorneys, Fort Lauderdale, for appellee, Broward County, Florida.

John M. Mullin and Robert L. Scheppske III of Tripp Scott, P.A., Fort Lauderdale, for appellee, Dania Entertainment Center, LLC.

## *On Motion for Rehearing*

MAY, J.

We grant the appellees' motions for rehearing, withdraw our prior opinion, and substitute the following.

This dispute arose from development agreements between the City of Dania Beach ("City") and the Dania Entertainment Center ("DEC") to expand the Dania Jai Alai pari-mutuel facility.

In 2006, the City entered into a development agreement with the pari-mutuel facility owner Aragon Group, Inc.  The agreement included the building of a new gaming facility and Jai Alai fronton.  In 2007, Broward County ("County") approved the plat for Dania Jai Alai for a 325,000 square foot gaming facility, which included 100,000 square feet of casino, a 1,000-seat fronton, and 187,000 square feet of accessory commercial use.  The County also approved two other parcels on the plat for 54 single-family detached units and 1.159 acres of active park.

Subsequently, the DEC purchased the property from Aragon. In 2011, the DEC sought to "amend and restate" the existing development agreement between the City and Aragon.  The new development agreement incorporated plans from the original agreement and added a marina, commercial retail, a new casino, and two hotel towers.  The City's attorney and outside counsel advised the pari-mutuel facility it was exempt from City regulations.  In May 2013, the DEC finalized the gaming licenses and permit rights transfers from Aragon.

Mr. Sniezek of the Broward County Planning Council wrote a letter and confirmed the City was not "required to allocate land use intensities under the 'Regional Activity Center' (RAC) land use designation on the Broward County Land Use Plan [] and located in the City" for the amended development.  His letter provided:

> *Based on the information provided by you,* it is Planning Council staff's understanding that the proposed hotel and marina uses are located within lands designated as a pari-mutuel by the State of Florida.  *Based on that information and in such context of Florida Statute 550.155(2), it would appear that the proposed use would qualify as a "capital improvement proposed by a permitholder licensed under this chapter to a pari-mutuel facility existing on June 23, 1981."*
>
> In consultation with the Planning Council Attorney and County Attorney's office, Planning Council staff has determined that the uses described in your correspondence are permitted *without a need to allocate land use intensities under the permitted uses of the RAC.*
>
> Please note that *this finding is subject to review and agreement by the City of Dania Beach.  In addition, the proposed uses must meet any other applicable requirements of Florida Statutes Chapter 550.*

(Emphasis added).

The statute referenced in the letter, section 550.155(2), Florida Statutes (2011), provides in pertinent part as follows:

> A *capital improvement proposed by a permitholder* licensed under this chapter *to a pari-mutuel facility* existing on June 23, 1981, which capital improvement requires, pursuant to any municipal or county ordinance, resolution, or regulation, the qualification or approval of the municipality or county wherein the permitholder conducts its business operations, *shall receive approval unless the municipality or county is able to show that the proposed improvement presents a justifiable and immediate hazard to the health and safety of municipal or county residents*, provided the permitholder pays to the municipality or county the cost of a building permit *and provided the capital improvement meets the following criteria*:
>
> (a) The improvement does not qualify as a development of regional impact as defined in s. 380.06; and
>
> (b) The improvement is contiguous to or within the existing pari-mutuel facility site.

(Emphasis added).

At the City Commission meeting in August 2011, City staff recommended approving the 2011 amended development agreement with the DEC, and the public had an opportunity to comment. After public comment, the City Commission voted unanimously to approve the 2011 development agreement.

The City and the DEC entered into the development agreement. That agreement stated the City had determined the proposed improvements did not present an immediate hazard to the City's residents' health and safety. The County was not a party to the agreement.

In 2011, Citizens for Responsible Development ("CFRD") and Herbert Simpson ("individual plaintiff", collectively "plaintiffs") sued the City for declaratory and injunctive relief. The complaint alleged CFRD was a non-profit public interest organization in Broward County. It alleged its membership included Dania Beach residents, who are adversely affected by the development agreement's proposed expansion.

3

The complaint further alleged Simpson was a legally blind resident living within one mile of Dania Jai Alai. The complaint sought a declaration that the 2011 development agreement was void because the City failed to comply with the Florida Local Government Development Agreement Act, sections 163.3220–163.3243, Florida Statutes (2011). The complaint sought to compel the City to comply with the Act. The DEC intervened in the proceedings.

In 2011 and 2012, the County approved two plat note amendments to the Dania Jai-Alai Plat.[1] The planning council, in consultation with its attorney and the County attorney, determined the pari-mutuel facility uses were exempt from being allocated as part of the RAC, pursuant to section 550.155. The 2012 plat note effectuated changes to comply with the Florida Department of Transportation's conditions of approval of the 2011 plat note amendment.

In 2014, the DEC sought a new development agreement, the "second amended agreement," which added a multi-story parking garage and a banquet hall. A public hearing was held on August 26, 2014, with advance notice published in the newspaper, posted at City Hall, and mailed to over 6,000 surrounding landowners. Members of the public were allowed to speak, including Simpson, who expressed concern about the traffic and being able to cross the street. After notice, a second public hearing was held.

At the third hearing, the CFRD's counsel objected to the meeting as not being noticed as a quasi-judicial hearing. Counsel offered documents and testimony to prove the currently proposed development agreement presented an immediate hazard to the health, safety, or welfare of the City's residents. The commission rejected the evidence. At the meeting's conclusion, the second amended agreement was approved and then executed by the City and the DEC. The County was not a party to the second amended agreement.

After the City's approval, CFRD and Simpson amended their complaint to allege the City ignored three sets of development laws: (1) the Development Agreement Act, sections 163.3220–163.3243, Florida

---

[1] The 2011 plat note amendment added several approved uses, including an additional 15 acres of pari-mutuel facility which could include 500 hotel rooms, 60 marina slips, and 45,000 square feet of commercial use. The 54 dwelling units and the park were to be deleted from the plat. According to the supporting material, the plat was subject to the "Dania Beach Regional Activity Center" ("RAC").

Statutes (2011); (2) the Dania Beach Unified Land Development Code; and (3) the Broward County Development and Land Use Codes.

The plaintiffs alleged the development agreements failed to comply with Chapter 163, Florida Statutes (2011), and thereby denied the public the ability to participate. They alleged the City failed to comply with the review requirements of its own code and development review process to determine the expansion's impact on the City and its residents. And finally, they alleged the City improperly gave "carte blanche" to the DEC based on section 550.155(2), Florida Statutes (2011).

The plaintiffs sought a declaration that section 550.155 did not apply to the Dania Jai Alai expansion, and the 2011 amended agreement was void as a result. Similarly, they sought a declaration that the 2014 development agreement was void. They also sought a declaration that section 550.155 was void as an unconstitutional special law.

The plaintiffs sought injunctive relief in two other counts, pursuant to section 163.3243. They requested the court declare the 2011 and 2014 approvals of the development agreements void because the City failed to comply with the public notice and hearing requirements of section 163.3225. They sought to compel the City to comply with section 163.3225.

The plaintiffs added the County as a defendant. They alleged the County "dropped the ball too" because it misinterpreted that section 550.155 exempted existing pari-mutuels from County land use regulations and review processes. The plaintiffs alleged the County did not investigate whether the Dania Jai Alai facility complied with section 550.155.

The plaintiffs also sought a declaration that the County erroneously relied on section 550.155 because that section did not apply. Alternatively, the County failed to apply its land use code or engage in developmental review in connection to the 2011 and 2014 development agreements.

All defendants answered, asserting multiple defenses, including the plaintiffs lacked standing. Ultimately, the parties filed cross-motions for summary judgment. While the motions raised several grounds, the trial court granted summary judgment in favor of the defendants on the standing issue alone.

The court found the plaintiffs lacked standing because they failed to show an "injury-in-fact." Specifically, the court found the CFRD failed to

demonstrate associational standing by showing a "substantial number of [CFRD's] members are substantially affected by the approval of the redevelopment." Citing to *Renard v. Dade Cnty.*, 261 So. 2d 832 (Fla. 1972), the court found the plaintiffs failed to meet one of the specific standing requirements of land use cases; i.e., to establish special damages. The court found neither plaintiff met that requirement. From this order, the CFRD and Simpson now appeal.

We have de novo review. *Volusia Cnty. v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000).

The only question raised in this appeal is whether the plaintiffs have standing. "Any litigant must demonstrate that he or she has standing to invoke the power of the court to determine the merits of an issue." *Giuffre v. Edwards*, 226 So. 3d 1034, 1038 (Fla. 4th DCA 2017) (quoting *Vaughan v. First Union Nat'l Bank of Fla.*, 740 So. 2d 1216, 1217 (Fla. 2d DCA 1999)).

"Standing depends on whether a party has a **sufficient** stake in a justiciable controversy, **with a legally cognizable interest** which would be affected by the outcome of the litigation." *Id.* at 1038-39 (emphasis added) (quoting *Weiss v. Johansen*, 898 So. 2d 1009, 1011 (Fla. 4th DCA 2005)).

- ***Does the Individual Plaintiff Have Standing?***

Our supreme court has articulated the three requirements for standing.

> First, a plaintiff must demonstrate an injury in fact, which is concrete, distinct and palpable, and actual or imminent. Second, a plaintiff must establish a causal connection between the injury and the conduct complained of. Third, a plaintiff must show a substantial likelihood that the requested relief will remedy the alleged injury in fact.

*State v. J.P.*, 907 So. 2d 1101, 1113 n.4 (Fla. 2004) (citations omitted). In short, standing requires injury-in-fact, causation, and redressability. *Id.* As the trial court found, the individual plaintiff failed to make the requisite showing.

6

Here, the trial court relied on *Renard,* where our supreme court addressed three types of attacks on zoning ordinances.[2] The supreme court articulated standing requirements for each case category.

> Part (1) deals with standing to enforce a valid zoning ordinance. The *Boucher*[3] rule requiring special damages still covers this type of suit. . . .

> Part (2) of the question certified to this Court deals with standing to attack a validly enacted zoning ordinance as being an unreasonable exercise of legislative power. . . . [P]ersons having a legally recognizable interest, which is adversely affected by the proposed zoning action, have standing to sue.

> Part (3) of the question certified deals with standing to attack a zoning ordinance which is void because not properly enacted, as where required notice was not given. Any affected resident, citizen or property owner of the governmental unit in question has standing to challenge such an ordinance.

*Id.* at 837–38.

In its order, the trial court focused on Part 1 and held the plaintiffs failed to establish a "special injury". Because the individual plaintiff's alleged injury (increased traffic) did not relate to the property where the individual plaintiff resided, the trial court found the individual plaintiff did not suffer an "injury-in-fact."

The dissent, however, has chosen to focus on Part 3, which "deals with standing to attack a zoning ordinance which is void because not properly enacted." *Id.* at 837-38. The dissent then conflates development agreements with zoning ordinances and characterizes the plaintiffs' complaint as an attack on the process used to approve the development

---

[2] *Renard* did not involve or address development agreements.

[3] *Boucher v. Novotny,* 102 So. 2d 132, 135 (Fla. 1958) ("[O]ne seeking redress, either preventive or corrective, against an alleged violation of a municipal zoning ordinance must allege and prove special damages peculiar to himself differing in kind as distinguished from damages differing in degree suffered by the community as a whole.").

agreements.[4]  The dissent does so to avoid any requirement of special damages under *Renard.*

So, we must look at what the plaintiffs alleged.

- Since 2011, the City repeatedly has either intentionally or mistakenly ignored the actual requirements of State law as it applies to the Dania Jai Alai proposed mega-expansion.

- The uses contained within the mega-expansion are not permitted within the zoning districts applicable to the property.

- The City failed to apply the land development regulations for the applicable zoning districts, so as to ensure that the uses contained within the mega-expansion are consistent with the community's character.

These are allegations the City failed to comply with its own ordinances, which the plaintiffs now seek to enforce.  That sounds suspiciously like *Renard* Part 1, which addresses standing to enforce a valid zoning ordinance.  To have that standing, the individual plaintiff must show a "special injury."  What the complaint does NOT allege is that the City's zoning ordinances are "void because not properly enacted, as where required notice was not given."  *See Renard,* 261 So. 2d at 838.

Under *J.P.*'s three-part standing test, the individual plaintiff failed to establish an injury-in-fact, causation, and redressability.  Under *Renard,* Part 1 applies and the individual plaintiff failed to establish special damages and therefore has no standing.

---

[4] Development agreements and zoning ordinances are not the same.  "[A] 'development agreement' has been defined as 'a contract between a [local government] and a property owner/developer, which provides the developer with vested rights by freezing the existing zoning regulations applicable to a property in exchange for public benefits.'" *Pres. Palm Beach Pol. Action Comm. v. Town of Palm Beach,* 50 So. 3d 1176, 1179 (Fla. 4th DCA 2011) (second alteration in original) (quoting *Morgran Co. v. Orange County,* 818 So. 2d 640, 643 (Fla. 5th DCA 2002)).

A zoning ordinance is a local legislative enactment, not a contract.  *See Lee County v. Morales,* 557 So. 2d 652, 655 (Fla. 2d DCA 1990) (explaining zoning is a legislative function).

Plaintiffs claim because the individual plaintiff is legally blind, increased traffic resulting from the DEC's capital improvement creates the required injury-in-fact.  But it doesn't.  The injury alleged by the individual plaintiff is purely conjectural — being hit by a car nearly a mile from his home.  It is not an injury-in-fact, "which is concrete, distinct and palpable, and actual or imminent."  *J.P.*, 907 So. 2d at 1113 n.4 (internal quotation marks omitted).  And it is certainly not a "special injury" under *Renard* Part 1.

Indeed, the Second District has held increased traffic is "only damage[] differing in degree from [that] suffered by the community as a whole and [is] not [a] special damage[] . . . differ[ent] in kind."  *Skaggs-Alberton's Prop., Inc. v. Michels Belleair Bluffs Pharmacy, Inc.*, 332 So. 2d 113, 117 (Fla. 2d DCA 1976).  To reach this conclusion, the Second District relied on a Georgia decision, which explained:

> The mere increase in traffic congestion adjacent to one's property as the result of improvements erected on nearby property and the attendant inconvenience resulting therefrom which are damages suffered alike by all property owners similarly situated, does not give to one individual such a substantial interest in the decision of the Board of Adjustment permitting the improvement as to authorize an appeal therefrom.  Such increase in traffic congestion and attendant difficulties in finding parking places are matters which address themselves to the police authorities of the municipality rather than to the zoning authorities.
> . . . .
>
> Such an inconvenience is a condition incident to urban living.

*Id.* (quoting *Victoria Corp. v. Atlanta Merch. Mart, Inc.*, 112 S.E.2d 793, 795 (Ga. Ct. App. 1960)).  The individual plaintiff has no injury in fact, no special injury under *Renard*, and no standing.

- ### *Does CFRD Have Standing?*

For the CFRD to establish standing, it must prove:

> (1) A substantial number of the [a]ssociation's members, although not necessarily a majority, are substantially affected by the challenged rule; (2) The subject matter of the rule is within the association's general scope of interest and activity;

and (3) The relief requested is the type appropriate for a trade association to receive on behalf of its members.

*Hillsborough Cnty. v. Fla. Rest. Ass'n*, 603 So. 2d 587, 589 n.1 (Fla. 2d DCA 1992) (quoting *Fla. Home Builders Ass'n v. Dep't of Labor & Emp. Sec.*, 412 So. 2d 351, 353-54 (Fla. 1982)).

Here, the CFRD also failed to show standing. The trial court determined: "[T]here is no record evidence that a substantial number of its members are or will be substantially affected by the [d]efendants' actions." At the hearing on the summary judgment motions, the CFRD relied on the individual plaintiff's alleged injury, and suggested another member lives within 300 feet of the facility. But as explained above, the individual plaintiff lacks standing and so does the association.

- ***Broward County***

The County adopts the City's and the DEC's arguments but has its own unique position concerning the litigation. It argues that it is a stranger to the development agreements, took no part in them, and has no control over the City's decisions. It also argues regardless of the "injury in fact" or "special injury" requirement, the plaintiffs cannot establish the second and third requirements for standing: causal connection and redressability. The County relies on *DeSantis v. Fla. Educ. Ass'n*, 306 So. 3d 1202 (Fla. 1st DCA 2020).

In *DeSantis*, plaintiffs sued several state officials, including Governor DeSantis, because they disagreed with the State's plan for reopening schools during the pandemic. *Id.* at 1208. The First District concluded the plaintiffs failed to satisfy the causation and redressability requirements of standing. *Id.* at 1214. Individual school districts, not state officials, had the discretion to return to in-person learning and so were the actual "cause" of the plaintiffs' alleged injuries. *Id.* The Governor could not be the cause. *Id.*

The plaintiffs also failed to satisfy the redressability requirement because whatever the outcome of their lawsuit, "the choice of how to deliver education to students remain[ed] with Florida's school boards," not the Governor. *Id.*

Here, the County did not cause the plaintiffs' alleged injury. That injury relates solely to the City's alleged defective approval of the development agreements. The DEC and the City are the parties to the

development agreements and the cause, if any, of an alleged injury. The County played no role in the development agreements.

To the extent the plaintiffs rely on the 2011 Sniezek Opinion, they are misguided. The 2011 Sniezek Opinion was issued by the Planning Council—not the County. They are different governmental entities, and the County had no control over, or responsibility for, the actions of either the Planning Council or Mr. Sniezek.

The plain language of both development agreements indicates the City "confirm[ed]" an allocation of use from the RAC was not required and then explained this conclusion was "consistent with" Mr. Sniezek's opinion. The development agreements themselves do not indicate the Sniezek Opinion controlled the City's actions. And an adverse decision against the County would not redress the plaintiffs' alleged injury because the County has no control over the City, the DEC, or the development agreements.

For these reasons, the plaintiffs have no standing to sue the County.

As the trial court concluded, neither the individual plaintiff nor the CFRD had standing to bring this action against the City, the DEC, or the County. The trial court correctly entered summary judgment for the defendants. We affirm.

*Affirmed.*

CIKLIN, J., concur.
WARNER, J., dissents with opinion.

WARNER, J., dissenting.

I dissent, because I believe that the standing issue is governed by the third category set forth in *Renard v. Dade County*, 261 So. 2d 832, 838 (Fla. 1972). Any affected resident has "standing to attack a zoning ordinance which is void because not properly enacted, as where required notice was not given." *Id.* Because appellants, affected residents, were challenging the development agreements as void, due to both lack of notice and the City's failure to follow its own zoning code as to the process of adopting a zoning ordinance, they had standing. I contend that the development agreement in this case is the equivalent of a zoning ordinance for purposes of standing.

11

Stripped to its essence, the City of Dania Beach entered into a contract with DEC to develop a substantial portion of land around the Dania Beach Jai Lai. It held a public meeting on the first iteration of the agreement, and public hearing on the next, but the City did not follow either the Florida Local Development Agreement Act, section 163.3221, et seq. or its own land use code.[5] The commission voted to approve each agreement, affirmatively refusing to apply its code, concluding that section 550.1555(2), Florida Statutes (2011) prohibited their application. That section provides that a capital improvement to a pari-mutuel facility which requires municipal, or county approval shall receive such approval under certain circumstances.

The development agreement in this case allowed for changes in the plat and rezoning of property, if necessary, to accomplish the Capital Improvement Plan for the properties surrounding the Jai Lai. It requires vacation of a city street running through the property (which had been dedicated to the City), and it provides for the issuance of building permits in accordance with the agreement. In other words, it is the equivalent of a zoning ordinance.

*Renard* allows an affected person to challenge a void ordinance without showing special damages.[6] 261 So. 2d at 832. The *Renard* court cited *Rhodes v. City of Homestead*, 248 So. 2d 674 (Fla. 3d DCA 1971), in a footnote as support for standing to attack a zoning ordinance as void because it was not properly enacted. *Renard*, 261 So. 2d at 838 n.14.

In *Rhodes*, the Third District said:

---

[5] Dania Beach Unified Land Development Code and Broward County Development and Land Use Codes.

[6] City argues that plaintiffs' reliance upon the distinctions in *Renard* as to standing requirements that do not require proof of special damages were disavowed in *Herbits v. City of Miami*, 207 So. 3d 274 (Fla. 3d DCA 2016), because the Third District held those distinctions were impliedly overruled. *Id.* at 284. In *Herbits*, the Third District cited to its own decision in *Renard v. Dade County*, 249 So. 2d 500 (Fla. 3d DCA 1971), rather than the supreme court decision. *Herbits*, 207 So. 3d at 283–84. We do not agree with *Herbits*, that the *Renard* distinctions have been *sub silentio* overruled by the supreme court. First, the supreme court does not intentionally overrule itself *sub silentio*. *See Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002). Second, *Herbits* relied on *Solares v. City of Miami*, 166 So. 3d 887 (Fla. 3d DCA 2015), but that case dealt with taxpayer standing to challenge a lease negotiated by the city, not a zoning case. *Herbits*, 207 So. 3d 274.

12

> The rule or ground [that the plaintiffs must show a special damage to attack a zoning decision] presented by defendants in moving to dismiss *has no application where a person affected seeks to challenge such action of the city on the ground . . . that the proceedings of the city board or council which resulted in such action were conducted contrary to provisions of the charter*, such as by failure to the city to give notice required by its charter, as alleged here.

*Id.* at 674–75 (emphasis supplied); *see also Parsons v. City of Jacksonville*, 295 So. 3d 892, 894 (Fla. 1st DCA 2020) ("Under Florida law, no special injury is required for actions attacking void ordinances; i.e., ordinances adopted without proper notice or legislative authority, or in excess of police powers."). Similarly, in *Upper Keys Citizens Ass'n, Inc. v. Wedel*, 341 So. 2d 1062 (Fla. 3d DCA 1977), the court held no special injury requirement for standing applied to an attack on a variance on the grounds that it was illegally enacted and void because the county did not follow its zoning regulations. *Id.* at 1064. Therefore, the court concluded that the plaintiff, a non-profit corporation whose members were citizens of the county, had standing to sue to declare the variance illegal and void. *Id.*

This is precisely what these appellants claim, i.e., that the city did not follow the process of their land use code or the Florida Local Government Development Agreement Act. They allege that there was inadequate notice with respect to the approval of both the 2011 and 2014 development agreements. The allegations are not challenges to the substantive zoning decision, but challenges to the procedure for approving the development agreements. Furthermore, appellants' complaint alleged that the City affirmatively failed to follow its code provisions by its application of section 550.155. Because it did not apply its own code, the commission's approval of the development agreement was invalid. The appellants, as affected residents, had standing to assert the commission's actions as void. No showing of special damage was necessary.

The majority disagrees that this development agreement could be tantamount to a zoning ordinance for purposes of the application of *Renard*. In a footnote, the majority cites to *Morgran Co. v. Orange County*, 818 So. 2d 640, 643 (Fla. 5th DCA 2002) for the proposition that a development agreement is a "contract between a [local government] and a property owner/developer, which provides the developer with vested rights by freezing the existing zoning regulations applicable to a property in exchange for public benefits."

13

The *Morgran* court quoted from Brad K. Schwartz, *Development Agreements: Contracting for Vested Rights*, 28 B.C. Envtl. Aff. L.Rev. 719 (Summer 2001). The article discusses development agreements and explains that these agreements are contract zoning, which is illegal, if not based upon enabling legislation:

> Contract zoning refers to an ad hoc agreement between a municipality and a developer regarding rezoning. In the traditional view, contract zoning is per se invalid, but courts are increasingly rejecting this approach and upholding certain forms of contract zoning. Specifically, courts distinguish between bilateral and unilateral contracts. A bilateral contract in which a municipality promises to rezone property is illegal because the municipality bypasses the notice and hearing phases of the legislative process, thereby depriving interested parties of due process. On the other hand, a unilateral contract in which a developer makes a promise contingent on the municipality's act of rezoning is legal. Because the municipality does not promise to take action prior to the zoning hearing, it does not circumvent the legislative process. In short, contract zoning is illegal whenever it arises from a promise by a municipality to zone property in a certain manner, whether in a bilateral contract or unilateral contract initiated by the municipality.
>
> Development agreements take the form of bilateral contracts as the municipality and the developer exchange promises. As such, *absent legislative authority, development agreements constitute illegal contract zoning.* It is of critical legal consequence, therefore, that development agreements are entered into pursuant to express enabling legislation. Thus recognizing the central importance of development agreement legislation, it is worth noting the basic provisions found in a typical development agreement statute.

*Id.* at 728–29 (emphasis supplied).

*Morgran* also recognized that contract zoning is disapproved. 818 So. 2d at 642. The court cited to *Hartnett v. Austin,* 93 So. 2d 86 (Fla. 1956) which explained:

> A municipality has no authority to enter into a private contract with a property owner for the amendment of a zoning ordinance subject to various covenants and restrictions in a

14

collateral deed or agreement to be executed between the city and the property owner. Such collateral agreements have been void in all of the cases to which we have been referred. Any contrary rule would condone a violation of the long established principle that a municipality cannot contract away the exercise of its police powers.

*Id.* at 89 (internal citations omitted). *Hartnett* explains the limit of municipal power to enter into contract zoning:

In exercising its zoning powers the municipality must deal with well-defined classes of uses. If each parcel of property were zoned on the basis of variables that could enter into private contracts then the whole scheme and objective of community planning and zoning would collapse. The residential owner would never know when he was protected against commercial encroachment. The commercial establishments on 'Main Street' would never know when they had protection against inroads by smoke and noise producing industries. This is so because all genuine standards would have been eliminated from the zoning ordinance. The zoning classifications of each parcel would then be bottomed on individual agreements and private arrangements that would totally destroy uniformity. Both the benefits of and reasons for a well-ordered comprehensive zoning scheme would be eliminated.

The adoption of an ordinance is the exercise of municipal legislative power. *In the exercise of this governmental function a city cannot legislate by contract.* If it could, then each citizen would be governed by an individual rule based upon the best deal that he could make with the governing body. Such is certainly not consonant with our notion of government by rule of law that affects alike all similarly conditioned.

*Id.* (emphasis supplied).

Thus, the adoption of a development agreement which provides for contract zoning is void as beyond the power of the City unless there is legislative authority for its enactment. Before the trial court, the City claimed authority through its Home Rule power, but the foregoing shows that it does not have the power to enter into contracts with private developers outside of enabling legislation. It must comply with its own

Land Development Code, which is the enabling legislation for zoning matters.

The complaint alleges that the approval of the development agreement occurred without notice in accordance with the code, nor without compliance with any of its procedures; in other words, without legislative authority. Therefore, based upon these allegations, *Renard* allows an affected resident to sue. I would reverse the court's summary judgment as to Counts 1, 2, 4, and 5.

In Counts 6 and 7, appellants sought an injunction to prevent enforcement of the development agreements for failure to comply with the notice provisions of the Florida Local Government Development Agreement Act. § 163.3225, Fla. Stat. The City maintains that the statute does not apply. After carefully reviewing the record and the statute, I agree.

Section 163.3220, Florida Statutes, provides in part:

> (3) . . . [I]t is the intent of the Legislature to encourage a stronger commitment to comprehensive and capital facilities planning, ensure the provision of adequate public facilities for development, encourage the efficient use of resources, and reduce the economic cost of development.

> (4) This intent is effected by authorizing local governments to enter into development agreements with developers, subject to the procedures and requirements of ss. 163.3220-163.3243.

> (5) *Sections 163.3220-163.3243 shall be regarded as supplemental and additional to the powers conferred upon local governments by other laws and shall not be regarded as in derogation of any powers now existing.*

(Emphasis supplied.). It appears that a local government does not have to adopt the provisions of the act. Section 163.3223, Florida Statutes, states:

> Any local government *may, by ordinance,* establish procedures and requirements, as provided in ss. 163.3220-163.3243, to consider and enter into a development agreement with any person having a legal or equitable interest in real property located within its jurisdiction.

(Emphasis supplied.). Thus, the notice provisions under the act in section 163.3225, which appellants contend the City violated, do not apply if the City did not adopt the provisions and provide for developer agreements.

There is nothing in the record to show that the City has adopted the statute, making section 163.3220 et seq. inapplicable. Because it is inapplicable, I would affirm the trial court's summary judgment on these counts based upon the tipsy coachman principle.[7]

Finally, the City and County both argue that the trial court should be affirmed on the tipsy coachman principle, because even if appellants have standing, the City's actions in approving the development agreement were required by section 550.155. While the majority has not addressed this issue because they affirm on the standing issue, I must address why I would still reverse. I disagree that tipsy coachman should apply, because there remain material issues of fact as to how section 550.155 should be applied.

Appellants claim in the complaint that the City and County improperly failed to apply their land use codes, because they erroneously found that the pari-mutuel facility was exempt from their application pursuant to section 550.155. There are several reasons to support their claim that the governmental entities are not exempt from following their own ordinances in development approval.

Section 550.155 provides:

> A capital improvement proposed by a permitholder licensed under this chapter to a pari-mutuel facility *existing* on June 23, 1981, *which capital improvement **requires**, pursuant to any municipal or county ordinance*, resolution, or regulation, *the qualification or approval of the municipality or county* wherein the permitholder conducts its business operations, <u>shall receive approval</u> unless the municipality or county is able to show that the proposed improvement presents a justifiable and immediate hazard to the health and safety of municipal or county residents, provided the permitholder pays to the municipality or county the cost of a building permit and provided the capital improvement meets the following criteria:

---

[7] *Dade Cnty. Sch. Bd. v. Radio Station WQBA*, 731 So.2d 638, 644–45 (Fla.1999).

(a) The improvement does not qualify as a development of regional impact as defined in s. 380.06; and

(b) The improvement is contiguous to or within the existing pari-mutuel facility site[.]

§ 550.155(2), Fla. Stat. (emphasis supplied). Nothing in the statute states that the capital improvement is "exempt" from the approval process. In fact, it contemplates that an approval process is required. Had the Legislature intended to exempt any capital improvement from proceeding through rezoning, building permit approval, and the like, it would have expressly stated as much. Thus, the County and the City wrongly interpreted this as altogether exempting the facility from the approval process. Instead, the statute requires the approval process, even though in the end it may compel the outcome.

There also remains a material issue of what constitutes the pari-mutuel facility. A pari-mutuel facility is defined in the statute as: "the grounds or property of a cardroom, racetrack, fronton, or other facility used by a licensed permitholder." § 550.002(22), Fla. Stat. (2011). Fronton is defined as "a building or enclosure that contains a playing court with three walls designed and constructed for playing the sport of jai alai or pelota." § 550.002(9), Fla. Stat. (2011).

Under the statute, the "facility" does not appear to be anything more than the building itself or the building with the parking lot. It does not comport with the statutory definitions that property across the street from the Fronton, or the docks in the water can constitute part of the pari-mutuel facility. The only evidence in the record relied on by the City and County is a letter from a Department of Business Regulation investigator which states that the entire property was "authorized for pari-mutuel *activity*." But that is not a statement that the entire property is a pari-mutuel *facility*.

Moreover, the statute applies to a pari-mutuel facility existing on June 23, 1981. There is no information in the record regarding the facility in existence on that date. If the land surrounding that 1981 facility was acquired after 1981, or the facility itself was expanded after 1981, then those additional land and improvements would not have been existing on that date, and thus the statute would not apply to any improvement of the expanded facility.

Finally, there is a material issue of fact as to what property is "contiguous to or within the existing pari-mutuel facility site." *See* §

18

550.155(2)(b), Fla. Stat. Given the definition of pari-mutuel facility in the statute, property across a street that was dedicated to the City would not qualify, even if the development agreement provided that the City was to vacate the street.

For those reasons, I do not think a tipsy coachman resolution is merited based on section 550.155(2), Florida Statutes.

WARNER, J., dissenting.

I dissent, because I believe that the standing issue is governed by the third category set forth in *Renard v. Dade County*, 261 So. 2d 832, 838 (Fla. 1972). Any affected resident has "standing to attack a zoning ordinance which is void because not properly enacted, as where required notice was not given." *Id.* Because appellants, affected residents, were challenging the development agreements as void, due to both lack of notice and the City's failure to follow its own zoning code as to the process of adopting a zoning ordinance, they had standing. I contend that the development agreement in this case is the equivalent of a zoning ordinance for purposes of standing.

Stripped to its essence, the City of Dania Beach entered into a contract with DEC to develop a substantial portion of land around the Dania Beach Jai Lai. It held a public meeting on the first iteration of the agreement, and public hearing on the next, but the City did not follow either the Florida Local Development Agreement Act, section 163.3221, et seq. or its own land use code.[8] The commission voted to approve each agreement, affirmatively refusing to apply its code, concluding that section 550.1555(2), Florida Statutes (2011) prohibited their application. That section provides that a capital improvement to a pari-mutuel facility which requires municipal, or county approval shall receive such approval under certain circumstances.

The development agreement in this case allowed for changes in the plat and rezoning of property, if necessary, to accomplish the Capital Improvement Plan for the properties surrounding the Jai Lai. It requires vacation of a city street running through the property (which had been dedicated to the City), and it provides for the issuance of building permits in accordance with the agreement. In other words, it is the equivalent of a zoning ordinance.

---

[8] Dania Beach Unified Land Development Code and Broward County Development and Land Use Codes.

19

*Renard* allows an affected person to challenge a void ordinance without showing special damages.[9]  261 So. 2d at 832.  The *Renard* court cited *Rhodes v. City of Homestead*, 248 So. 2d 674 (Fla. 3d DCA 1971), in a footnote as support for standing to attack a zoning ordinance as void because it was not properly enacted.  *Renard*, 261 So. 2d at 838 n.14.

In *Rhodes*, the Third District said:

> The rule or ground [that the plaintiffs must show a special damage to attack a zoning decision] presented by defendants in moving to dismiss *has no application where a person affected seeks to challenge such action of the city on the ground . . . that the proceedings of the city board or council which resulted in such action were conducted contrary to provisions of the charter*, such as by failure to the city to give notice required by its charter, as alleged here.

*Id.* at 674–75 (emphasis supplied); *see also Parsons v. City of Jacksonville*, 295 So. 3d 892, 894 (Fla. 1st DCA 2020) ("Under Florida law, no special injury is required for actions attacking void ordinances; i.e., ordinances adopted without proper notice or legislative authority, or in excess of police powers.").  Similarly, in *Upper Keys Citizens Ass'n, Inc. v. Wedel*, 341 So. 2d 1062 (Fla. 3d DCA 1977), the court held no special injury requirement for standing applied to an attack on a variance on the grounds that it was illegally enacted and void because the county did not follow its zoning regulations.  *Id.* at 1064.  Therefore, the court concluded that the plaintiff, a non-profit corporation whose members were citizens of the county, had standing to sue to declare the variance illegal and void.  *Id.*

---

[9] City argues that plaintiffs' reliance upon the distinctions in *Renard* as to standing requirements that do not require proof of special damages were disavowed in *Herbits v. City of Miami*, 207 So. 3d 274 (Fla. 3d DCA 2016), because the Third District held those distinctions were impliedly overruled.  *Id.* at 284.  In *Herbits*, the Third District cited to its own decision in *Renard v. Dade County*, 249 So. 2d 500 (Fla. 3d DCA 1971), rather than the supreme court decision.  *Herbits*, 207 So. 3d at 283–84.  We do not agree with *Herbits*, that the *Renard* distinctions have been *sub silentio* overruled by the supreme court.  First, the supreme court does not intentionally overrule itself *sub silentio*.  *See Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002).  Second, *Herbits* relied on *Solares v. City of Miami*, 166 So. 3d 887 (Fla. 3d DCA 2015), but that case dealt with taxpayer standing to challenge a lease negotiated by the city, not a zoning case.  *Herbits*, 207 So. 3d 274.

This is precisely what these appellants claim, i.e., that the city did not follow the process of their land use code or the Florida Local Government Development Agreement Act. They allege that there was inadequate notice with respect to the approval of both the 2011 and 2014 development agreements. The allegations are not challenges to the substantive zoning decision, but challenges to the procedure for approving the development agreements. Furthermore, appellants' complaint alleged that the City affirmatively failed to follow its code provisions by its application of section 550.155. Because it did not apply its own code, the commission's approval of the development agreement was invalid. The appellants, as affected residents, had standing to assert the commission's actions as void. No showing of special damage was necessary.

The majority disagrees that this development agreement could be tantamount to a zoning ordinance for purposes of the application of *Renard*. In a footnote, the majority cites to *Morgran Co. v. Orange County*, 818 So. 2d 640, 643 (Fla. 5th DCA 2002) for the proposition that a development agreement is a "contract between a [local government] and a property owner/developer, which provides the developer with vested rights by freezing the existing zoning regulations applicable to a property in exchange for public benefits."

The *Morgran* court quoted from Brad K. Schwartz, *Development Agreements: Contracting for Vested Rights*, 28 B.C. Envtl. Aff. L.Rev. 719 (Summer 2001). The article discusses development agreements and explains that these agreements are contract zoning, which is illegal, if not based upon enabling legislation:

> Contract zoning refers to an ad hoc agreement between a municipality and a developer regarding rezoning. In the traditional view, contract zoning is per se invalid, but courts are increasingly rejecting this approach and upholding certain forms of contract zoning. Specifically, courts distinguish between bilateral and unilateral contracts. A bilateral contract in which a municipality promises to rezone property is illegal because the municipality bypasses the notice and hearing phases of the legislative process, thereby depriving interested parties of due process. On the other hand, a unilateral contract in which a developer makes a promise contingent on the municipality's act of rezoning is legal. Because the municipality does not promise to take action prior to the zoning hearing, it does not circumvent the legislative process. In short, contract zoning is illegal whenever it arises from a promise by a municipality to zone

21

property in a certain manner, whether in a bilateral contract or unilateral contract initiated by the municipality.

Development agreements take the form of bilateral contracts as the municipality and the developer exchange promises. As such, *absent legislative authority, development agreements constitute illegal contract zoning.* It is of critical legal consequence, therefore, that development agreements are entered into pursuant to express enabling legislation. Thus recognizing the central importance of development agreement legislation, it is worth noting the basic provisions found in a typical development agreement statute.

*Id.* at 728–29 (emphasis supplied).

*Morgran* also recognized that contract zoning is disapproved. 818 So. 2d at 642. The court cited to *Hartnett v. Austin,* 93 So. 2d 86 (Fla. 1956) which explained:

A municipality has no authority to enter into a private contract with a property owner for the amendment of a zoning ordinance subject to various covenants and restrictions in a collateral deed or agreement to be executed between the city and the property owner. Such collateral agreements have been void in all of the cases to which we have been referred. Any contrary rule would condone a violation of the long established principle that a municipality cannot contract away the exercise of its police powers.

*Id.* at 89 (internal citations omitted). *Hartnett* explains the limit of municipal power to enter into contract zoning:

In exercising its zoning powers the municipality must deal with well-defined classes of uses. If each parcel of property were zoned on the basis of variables that could enter into private contracts then the whole scheme and objective of community planning and zoning would collapse. The residential owner would never know when he was protected against commercial encroachment. The commercial establishments on 'Main Street' would never know when they had protection against inroads by smoke and noise producing industries. This is so because all genuine standards would have been eliminated from the zoning ordinance. The zoning classifications of each parcel would then be bottomed on

22

individual agreements and private arrangements that would totally destroy uniformity.  Both the benefits of and reasons for a well-ordered comprehensive zoning scheme would be eliminated.

The adoption of an ordinance is the exercise of municipal legislative power.  *In the exercise of this governmental function a city cannot legislate by contract.*  If it could, then each citizen would be governed by an individual rule based upon the best deal that he could make with the governing body.  Such is certainly not consonant with our notion of government by rule of law that affects alike all similarly conditioned.

*Id.* (emphasis supplied).

Thus, the adoption of a development agreement which provides for contract zoning is void as beyond the power of the City unless there is legislative authority for its enactment.  Before the trial court, the City claimed authority through its Home Rule power, but the foregoing shows that it does not have the power to enter into contracts with private developers outside of enabling legislation.  It must comply with its own Land Development Code, which is the enabling legislation for zoning matters.

The complaint alleges that the approval of the development agreement occurred without notice in accordance with the code, nor without compliance with any of its procedures; in other words, without legislative authority.  Therefore, based upon these allegations, *Renard* allows an affected resident to sue.  I would reverse the court's summary judgment as to Counts 1, 2, 4, and 5.

In Counts 6 and 7, appellants sought an injunction to prevent enforcement of the development agreements for failure to comply with the notice provisions of the Florida Local Government Development Agreement Act.  § 163.3225, Fla. Stat.  The City maintains that the statute does not apply.  After carefully reviewing the record and the statute, I agree.

Section 163.3220, Florida Statutes, provides in part:

(3) . . . [I]t is the intent of the Legislature to encourage a stronger commitment to comprehensive and capital facilities planning, ensure the provision of adequate public facilities for development, encourage the efficient use of resources, and reduce the economic cost of development.

23

(4) This intent is effected by authorizing local governments to enter into development agreements with developers, subject to the procedures and requirements of ss. 163.3220-163.3243.

(5) *Sections 163.3220-163.3243 shall be regarded as supplemental and additional to the powers conferred upon local governments by other laws and shall not be regarded as in derogation of any powers now existing.*

(Emphasis supplied.). It appears that a local government does not have to adopt the provisions of the act. Section 163.3223, Florida Statutes, states:

Any local government *may, by ordinance*, establish procedures and requirements, as provided in ss. 163.3220-163.3243, to consider and enter into a development agreement with any person having a legal or equitable interest in real property located within its jurisdiction.

(Emphasis supplied.). Thus, the notice provisions under the act in section 163.3225, which appellants contend the City violated, do not apply if the City did not adopt the provisions and provide for developer agreements.

There is nothing in the record to show that the City has adopted the statute, making section 163.3220 et seq. inapplicable. Because it is inapplicable, I would affirm the trial court's summary judgment on these counts based upon the tipsy coachman principle.[10]

Finally, the City and County both argue that the trial court should be affirmed on the tipsy coachman principle, because even if appellants have standing, the City's actions in approving the development agreement were required by section 550.155. While the majority has not addressed this issue because they affirm on the standing issue, I must address why I would still reverse. I disagree that tipsy coachman should apply, because there remain material issues of fact as to how section 550.155 should be applied.

Appellants claim in the complaint that the City and County improperly failed to apply their land use codes, because they erroneously found that the pari-mutuel facility was exempt from their application pursuant to

---

[10] *Dade Cnty. Sch. Bd. v. Radio Station WQBA*, 731 So.2d 638, 644–45 (Fla.1999).

24

section 550.155.  There are several reasons to support their claim that the governmental entities are not exempt from following their own ordinances in development approval.

Section 550.155 provides:

> A capital improvement proposed by a permitholder licensed under this chapter to a pari-mutuel facility *existing* on June 23, 1981, *which capital improvement **requires**, pursuant to any municipal or county ordinance*, resolution, or regulation, *the qualification or approval of the municipality or county* wherein the permitholder conducts its business operations, _shall_ *receive approval* unless the municipality or county is able to show that the proposed improvement presents a justifiable and immediate hazard to the health and safety of municipal or county residents, provided the permitholder pays to the municipality or county the cost of a building permit and provided the capital improvement meets the following criteria:
>
> (c) The improvement does not qualify as a development of regional impact as defined in s. 380.06; and
>
> (d) The improvement is contiguous to or within the existing pari-mutuel facility site[.]

§ 550.155(2), Fla. Stat. (emphasis supplied).  Nothing in the statute states that the capital improvement is "exempt" from the approval process.  In fact, it contemplates that an approval process is required.  Had the Legislature intended to exempt any capital improvement from proceeding through rezoning, building permit approval, and the like, it would have expressly stated as much.  Thus, the County and the City wrongly interpreted this as altogether exempting the facility from the approval process.  Instead, the statute requires the approval process, even though in the end it may compel the outcome.

There also remains a material issue of  what constitutes the pari-mutuel facility.  A pari-mutuel facility is defined in the statute as: "the grounds or property of a cardroom, racetrack, fronton, or other facility used by a licensed permitholder."  § 550.002(22), Fla. Stat. (2011).  Fronton is defined as "a building or enclosure that contains a playing court with three walls designed and constructed for playing the sport of jai alai or pelota." § 550.002(9), Fla. Stat. (2011).

25

Under the statute, the "facility" does not appear to be anything more than the building itself or the building with the parking lot. It does not comport with the statutory definitions that property across the street from the Fronton, or the docks in the water can constitute part of the pari-mutuel facility. The only evidence in the record relied on by the City and County is a letter from a Department of Business Regulation investigator which states that the entire property was "authorized for pari-mutuel *activity*." But that is not a statement that the entire property is a pari-mutuel *facility*.

Moreover, the statute applies to a pari-mutuel facility existing on June 23, 1981. There is no information in the record regarding the facility in existence on that date. If the land surrounding that 1981 facility was acquired after 1981, or the facility itself was expanded after 1981, then those additional land and improvements would not have been existing on that date, and thus the statute would not apply to any improvement of the expanded facility.

Finally, there is a material issue of fact as to what property is "contiguous to or within the existing pari-mutuel facility site." *See* § 550.155(2)(b), Fla. Stat. Given the definition of pari-mutuel facility in the statute, property across a street that was dedicated to the City would not qualify, even if the development agreement provided that the City was to vacate the street.

For those reasons, I do not think a tipsy coachman resolution is merited based on section 550.155(2), Florida Statutes.

\*    \*    \*

***Not final until disposition of timely filed motion for rehearing.***